# EXHIBIT A



SDA - CONFIDENTIAL - UTXO BV - March 2021

# Master Software Development Agreement

This Master Software Development Agreement (the "Agreement") is entered into and made effective this 15th day of March, 2021 (the "Effective Date"), by and between **Power Block Coin LLC.**, represented by Aaron J. Tilton, solely in his capacity as a manager of Buyer, with registered offices at 1145 South 800 East, Suite 117, Orem Utah 84097 (the "Buyer") and **UTXO B.V**, represented by UTXO Lead Developer Daniel K. J. Stadelmann, with registered offices at Posthoornstraat 17. 3011WD Rotterdam, Netherlands (the "Developer"). The Buyer and the Developer shall collectively hereinafter be known as the "Parties" or "Party," as applicable.

**WHEREAS**, the Developer offers software development services with respect to custom blockchain systems and architecture design/development;

**WHEREAS**, the Buyer desires to retain the Developer to perform software development in connection with a custom blockchain system and network deployment;

**WHEREAS**, the Parties desire to enter into a business relationship pursuant to which, among other things, the Developer would develop such software with desired features and capabilities as specified by the Buyer; and

**WHEREAS,** this Agreement is intended to outline the terms and conditions applicable to the software development aspects of such business relationship between the Parties.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto covenant and agree as follows:

1. **DESCRIPTION OF MAIN SERVICES.** The Developer shall serve as an independent contractor of Buyer to design, develop, and implement various DeFi (decentralized Finance) technologies consisting of the following development phases and modules but not limited to these:

   a. **Mining Platform**
      i. Hash computing marketplace
      ii. Demurrage Coin (in e.i.)
      iii. DEX interop with Token/Marketplace
      iv. 3rd party chains, AuxPow Coins, etc. compatibility
      v. Staking, Baking, Validation service/pool
      vi. ETH Marketplace Integration
      vii. Required Mining tools and GUIs

   b. **SmartDEX** - customized **DEX core**
      i. LoanCC Interop
      ii. Smart Derivates/Options
      iii. Demurrage Coin interop
      iv. XCAT trading
      v. Uniswap and other 3rd party protocol integrations
      vi. KYC Layer - Pubkey whitelisting
      vii. LE Node
      viii. WebSmartDEX
      ix. FIAT Gateway
      x. Proxies
      xi. Smart Receipts
      xii. Maker Tools

SDA - CONFIDENTIAL - UTXO BV - March 2021

    c. **DEX GUIs** (graphical user interfaces for Desktop, Mobile and Web)
- i. Custom GUIs
- ii. Prime Brokerage client

    d. **Custom Consensus Modules** (for cross-operation with the standalone AuxPoW PBC blockchain - e.g. **LoanCC** and **Mining pool coinbase distribution**).

    e. **Further** custom **blockchains and/or tokens**
- i. Demurrage Coin
- ii. Speculative Coin
- iii. et cetera

    f. Various **third-party integrations** and compatibility achievement:
- i. Hardware Wallets such as Trezor and Ledger
- ii. Payment service libraries
- iii. Bot integrations and libraries
- iv. Other required libraries for DeFi stack compatibility and tech support

    g. All services listed above consist of inception and Development phase:
- i. Architecture/System Design (SRS/SDP)
- ii. Development

    h. In addition, each module/tech-layer undergoes full **Quality Assurance** process.

    i. **Revision Delivered Software is subject to modifications and enhancements according to PBC's requests and feedback. Such changes are executed in iterative revision processes.**

    j. **Deployment The UTXO BV team will manage the DeFi related infrastructure setup. The infrastructure serves DeFi platform operations. Process of infrastructure setup, installation, and launch (deployment) of SmartFi DeFi software and services is pooled into the term "deployment".**

2. **ADDITIONAL SERVICES.**

    a. **Consulting Services.** In addition to Software Architecture Design and Development the Developer shall provide **recruitment, training and supervision of IT experts dedicated to an PBC inhouse DeFi developer division** responsible for SmartFI DeFi platform operation, maintenance, quality assurance and development. The developer shall provide **consulting services and advisory related to PBC CeFi platform** included but not limited to **secure code review, arrangement and/or advise ref. third party security assessments** by third party security experts and more.

    b. **Maintenance Services.** Until PBC has own in-house tech expert division to execute maintenance and platform operations (dev, devops, opsec, infosec, devsec, monitoring, etc) UTXO BV team will cover full maintenance and platform operations including but not limited to server hosting and infrastructure and DeFI platform monitoring, tech support for PBC/SmartFI team, training and onboarding supervision, documentation, testing and deployment, regular upgrade and further services as part of "platform maintenance".

3. **TIMELINES AND SPECIFICATIONS.** The Parties shall work together to develop separate, more detailed documents to outline precise software specifications, timelines (including, but not limited to, roll out deadlines and phases of completion) and set expectations as to delivery of such Software. Timelines for final delivery of all software modules of the DeFi Software, including all versions in either source code or object code form, will be set after completion of

corresponding inception phases.

The timelines and specifications addressed herein should be in a format that makes these enforceable, measurable, and accurate to assist both the Buyer and the Developer in planning and delivery stages. The Parties agree that the Developer will draft the initial timelines and specifications of the Software development during the execution of the development phase related to this agreement. The Buyer shall then receive a copy of same, and the Parties will work to negotiate a mutually agreeable plan for the development of the Software. The Parties acknowledge and agree that this outline shall be as detailed as possible, as inadequate specifications could cause the Buyer to incur costs for variations and extensions to ensure that the final version of Software is suitable and achieves the objectives for its development. In the event that the parties cannot negotiate a mutually agreeable plan for the development of the Software, Buyer shall have the right to terminate the Agreement. Such service shall only be provided with the prior written consent of the Buyer.

Developer will provide the following deliverables at the specified time for the remainder of calendar year 2021. The parties will agree to future timelines in addenda to this Agreement.

a. **Q2 (current quarter) - listed dates are delivery deadlines:**

(i) SFUSD Chain relaunch - until May 15, 2021
(ii) Permissioned Mining / Mining Consensus (exclusive mining) - until May 15, 2021
(iii) Speculative Coin (SMFT) BEP20 token launch - until May 15, 2021
(iv) SmartFi CeFi platform (portal) review and feedback report - until June 1, 2021
(v) SmartDEX GUI rebrand finalisation with new SFUSD coin and SMFT Token - until June 15, 2021
(vi) SmartFi portal generic pentest report - until June 30, 2021
(vii) LoanCC plan and SRS/arch design - until June 30, 2021

b. **Q3:**

(i) Ledger and Trezor Hardware wallet compatibility for SFUSD - until August 30, 2021
(ii) Tokenization GUI (SecWallet customisation) - until August 30, 2021
(iii) SmartDEX webDEX alpha with API integration to SmartFI portal - until September 30, 2021
(iv) Permissioned chain layer SRS/arch design (DAML) - until September 30, 2021

c. **Q4:**

(i) Hash Marketplace (nice-hash service) - until November 30, 2021
(ii) Staking, Baking, Validation service - until November 30, 2021
(iii) webDEX revision (beta) - until December 31, 2021
(iv) Maker Tools / LP services - until December 31, 2021
(v) EoY report - until December 31, 2021

In addition to the deliverables listed above, Developer will cover further responsibilities, including but not limited to, network and infrastructure maintenance, short-term revisions and bug-fixing, reviews, continuous testing and quality assurance and DeFi stack project management and planning.

4. **ANCILLARY SOFTWARE.** The Developer shall assist and consult with the Buyer concerning ancillary and related software and IT/infrastructure for the development and/or installation of the Software. However, it shall be Buyer's responsibility to purchase, install, and maintain any such products. Any service done by the Developer in this regard, or beyond the scope of this Software Development Agreement shall be done as a separate service from the development of the Software and the service shall be performed on an hourly basis at the rate of $*300* per

SDA - CONFIDENTIAL - UTXO BV - March 2021

hour, payable upon receipt of detailed invoice from Developer.

5. **TIME IS OF THE ESSENCE.** The Parties agree that time is of the essence and desire to timely identify any critical elements of the Software development and/or any specific deliverables. Once these timelines and deadlines are agreed upon, the Parties agree that processes will be disrupted should these deadlines pass without deliverable product. The Parties agree that liquidated damages would be appropriate for any delay in the project beyond the expected deadlines (as adjusted from time to time). A fee of Thirty Thousand and Zero Dollars ($30,000.00) shall be due from Developer to Buyer should any module of this project (modules TBA) extend beyond its deadline by more than one (1) month ("Deadline Fee"). The Deadline Fee shall accrue at the end of the one (1) month extension deadline.

6. **CHANGE IN SPECIFICATIONS**. Buyer may, in its sole discretion, request that changes be made to the specifications or other aspects of this Agreement and tasks associated with the Agreement. If Buyer requests such a change, Developer will use its best efforts to implement the requested change at no additional expense to Buyer and without delaying delivery of the Software. In the event that the proposed change will, in the reasonable opinion of Developer, require a delay in delivery of the Software or would result in additional expense to Buyer, then Buyer and Developer shall confer and Buyer shall, in its sole discretion, elect either to withdraw its proposed change or require Developer to deliver the Software with the proposed change subject to the delay and/or additional expense.

7. **FURTHER DEVELOPMENT AND FUTURE COOPERATION.** Further development of Software may be contemplated by the Parties as Buyer moves through phases of its development. For any upgrades, modifications, or projects beyond maintenance of the current Software (as described in module1 inception phase report), the Parties shall execute an addendum to this Agreement that encapsulates the work to be performed by Developer to complete a phase and the compensation it will receive from Buyer. The provision of further development by Developer shall be contingent upon negotiation of a mutually agreeable fee and the availability of the Developer and/or Developer's personnel to complete such work. Developer will make all reasonable efforts to meet the needs of Buyer with respect to further development for phases and to provide sufficient personnel to meet Developer's needs. Developer acknowledges and understands that its willingness and ability to provide further development of software for Buyer is a material reason why Buyer is entering into this Agreement.

8. **COMPENSATION**. Buyer shall pay Developer a total yearly development fee of $1,800,000.00 (One Million Eight Hundred Thousand and Zero Dollars) ("Compensation") for software development and maintenance of same during the term of this Agreement. The Parties agree that Buyer shall make twelve (12) equal installments in the amount of $150,000.00 (One Hundred Fifty Thousand and Zero Dollars) at the beginning of each month during the term of one year. Developer agrees to deposit 10 BTC (Ten Bitcoin) as a security deposit at the beginning of each quarter which Buyer will return in equal monthly installments during the term of one quarter (4 months).

    a. **Expenses**. Buyer shall reimburse Developer for reasonable out-of-pocket expenses, including, but not limited to, airfare, lodging, meals, and automobile rental incurred by Developer during the development of Software on behalf of Buyer and expenses incurred as a direct result of a request for travel from the Buyer. Developer shall complete paperwork as reasonably requested by the Buyer and provide supporting documentation of all expenses incurred. Travel expenses shall be reimbursed for Developer's personnel essential to the Software development project with Buyer. In the event that the expenses are anticipated to be over $100 USD, Developer shall seek pre-approval of anticipated expenses from the Buyer.

SDA - CONFIDENTIAL - UTXO BV - March 2021

b. **Maintenance**. "Maintenance" shall be limited to services necessary to keep the current Software functioning properly (based upon the Software's agree-upon scope of work), including critical security bug fixes, but shall not include any new features, modifications, improvements and/or upgrades – the same applies for network or infrastructure operations beyond the initial deployment scope.

9. **TERM**. This Agreement shall commence as of the Effective Date written above and shall continue until one (1) year beyond the final delivery date of the Software, including all versions in either source code or object code form, to allow for the maintenance of same (the "Term"). The term of this Agreement may be extended by mutual agreement of the parties in the addenda to the Agreement that they anticipate they will be agreeing to in the future.

10. **TERMINATION**. This Agreement shall terminate upon the occurrence of any of the following: (i) in the event either Party defaults in any material obligation owed to the other Party pursuant to this Agreement, then this Agreement may be terminated if the default is not cured following at least forty-five (45) days' written notice to the defaulting party or (ii) either party is bankrupt or insolvent, or bankruptcy or insolvency proceedings are instituted against a Party and the proceeding is not dismissed within sixty (60) days of commencement. The terms under Ownership of Software and Confidentiality in this Agreement shall survive the expiration or termination of this Agreement.

11. **PERFORMANCE AND ACCEPTANCE TESTING**. Acceptance testing will follow each key stage of Software development and delivery to the Buyer. The Buyer shall test the Software according to the specifications outlined for the services. The Buyer shall perform such acceptance testing within fourteen (14) business days from receipt of that phase of Software development. At such time (or earlier if applicable), the Buyer shall communicate to the Developer any issues that arise during the acceptance testing. The Developer will then review any deviations, correct them, and re-submit in a timely and reasonable manner to the Buyer for additional acceptance testing.

12. **OWNERSHIP OF SOFTWARE**. Developer agrees that the development of the Software is "work made for hire" and that the Software shall be the sole property of Buyer. Developer hereby assigns to Buyer, without further compensation, all of its rights, including but not limited to derivative rights, title, and interest in and to the custom Software elements and any and all related patents, patent applications, copyrights, copyright applications, trademarks, trademark applications, and trade names in the United States and elsewhere. Developer will keep and maintain adequate and current written records with respect to the Software (in the form of notes, sketches, drawings, and as may otherwise be specified by Buyer), which records shall be available to and remain the sole property of Buyer at all times. All versions of the Software shall contain Buyer's conspicuous notice of copyright. Developer will assist Buyer in obtaining and enforcing patent, copyright, and other forms of legal protection for the Software in any country. Upon request, Developer will sign all applications, assignments, instruments, and papers and perform all acts necessary or desired by Buyer to assign the Software fully and completely to Buyer and to enable Buyer, its successors, assigns, and nominees, to secure and enjoy the full and exclusive benefits and advantages thereof. Developer will not provide any copy of the Software to any party other than Buyer.

Developer informs Buyer that the developed software does utilise third party open-source libraries and software whose licenses remain unaffected by this agreement.

SDA - CONFIDENTIAL - UTXO BV - March 2021

13. **WARRANTIES**.

   a. **Warranty**. Developer hereby warrants to Buyer that any software developed, and Buyer's use of it, does not infringe on any third-party copyright, patent or trademark.

   b. **Indemnity**. Additionally, Developer hereby agrees to indemnify and hold harmless the Buyer (and its respective directors, officers, manager, partners, members, shareholders, affiliates, agents, attorneys, successors, and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages, and expenses (including, but not limited to, reasonable attorneys' fees, charges, and disbursements) incurred by the Developer as a result of any third-party copyright, patent or trademark infringement claim arising out of any software developed under this Agreement.

   c. **Software Warranty**. Developer warrants that for a period of one year commencing on the date of Buyer's Acceptance of the Software ("Software Warranty Period"), provided the Software is not altered by Buyer, and provided the Software is used in accordance with Developer's recommended maintenance procedures, the Software shall function during the Software Warranty Period without defects which materially affect Buyer's use of the Software in accordance with Buyer's Specifications for the Software. In the event the Software fails to so perform and Buyer's use of the Software is materially affected by such failure, Buyer's exclusive remedy under this warranty is to require Developer to correct such failure and such remedy is conditioned upon Developer's receiving written notice (or oral notice promptly confirmed in writing) within this period of such failure. The correction of any Software failure shall not extend the Software Warranty Period.

14. **INDEPENDENT CONTRACTOR**. Developer is acting as an independent contractor with respect to the services provided to Buyer. Neither Developer nor the employees of Developer performing services for the Buyer will be considered employees or agents of the Buyer. Buyer will not be responsible for Developer's acts or the acts of Developer's employees while performing services under this Agreement. Nothing contained in this Agreement shall be construed to imply a joint venture, partnership, or principal-agent relationship between the Parties, and that neither Party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other Party.

   a. **Development Staff**. Developer will utilize employees and/or contractors capable of designing and implementing the Software to be developed hereunder. All work shall be performed in a professional and competent manner. Developer shall arrange for such employees and/or contractors, if any, to execute and deliver any document or instrument reasonably requested by Buyer to reflect Buyer's ownership of the Software or in connection with any application for patent or copyright. Developer confirms that its employees and/or contractors signed a confidentiality agreement concerning the Software development for Buyer, prior to working on the project.

   b. **Monitoring**. Buyer shall have the right to reasonably observe and monitor all aspects of the performance by Developer of its obligations hereunder and Developer shall use reasonable efforts to facilitate such observation and monitoring. Information, functions, and operations of Developer not directly related to its obligations hereunder shall not be subject to observation and monitoring by Buyer.

15. **CONFIDENTIALITY**. Developer acknowledges that all material and information supplied by Buyer which has or will come into Developer's possession or knowledge of Developer in connection with its performance hereunder is to be considered Buyer's confidential and proprietary information (the "Confidential Information"). By way of example, but not as a limitation, Confidential Information includes the Software, trade secrets, processes, data, knowhow, program codes, documentation, flowcharts, algorithms, marketing plans, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee and customer lists. Developer's undertakings and obligations under this section will not apply, however, to any Confidential Information which: (i) is or becomes generally known to the public through no action on Developer's part, (ii) is generally disclosed to third parties by Buyer without restriction to such third parties, or (iii) is approved for release by written authorization of Buyer. Upon termination of this Agreement or any other time upon request, Developer will promptly deliver to Buyer all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Developer or others, which contain Confidential Information. Developer acknowledges that Confidential Information is the sole property of Buyer. Developer agrees that disclosure of such information to, or use by, third parties, either during or after this Agreement, will cause Buyer irreparable damage. Developer agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Developer's employees or contractors with a need to know such information and not to release or disclose it to any other party. Developer further agrees not to release such information to any employee or contractor who has not signed a written agreement between the Developer and the employee or contractor expressly binding the employee or contractor not to disclose the Confidential Information, except as expressly permitted herein. Buyer shall be listed as a third-party beneficiary of any such agreement. Developer will notify Buyer in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information. At any time, upon request, the Developer will return any such information within its possession to Buyer. In the event that a third party seeks to compel production of the Confidential Information as part of a legal proceeding, Developer shall immediately notify Buyer so Buyer can determine necessary steps to protect the Confidential Information.

Developer acknowledges that Buyer's purpose in pursuing the development of the Software is to gain a significant competitive advantage over competitors operating without such Software and that such advantage will be jeopardized if such competitors learn of Buyer's negotiations with Developer or the performance by Developer of its obligations hereunder. Accordingly, Developer agrees to keep such negotiations and performance of its obligations hereunder strictly confidential and not to disclose any information to any third party or entity without the prior written permission of Buyer. In no event shall Developer or any of its employees or contractors use Buyer as a reference in marketing Developer's services to any third party or entity without Buyer's prior written permission.

16. **TRAINING**. Developer shall provide Buyer and its employees with training consultations with respect to the use of the Software as may reasonably be requested by Buyer from time to time for six (6) months after final delivery and acceptance at no additional costs to Buyer ("Training Period"). Developer shall deliver a detailed user's manual to Buyer on or before completion of acceptance that will enable Buyer's employees who are otherwise unfamiliar with the Software to become adequately informed about using the blockchain daemon RPC interface. All training

SDA - CONFIDENTIAL - UTXO BV - March 2021

that Developer is required to provide hereunder shall be performed at such locations and at such times as are mutually agreed to by the Parties. Upon the expiration of the Training Period and following Buyer's request, Developer will provide any support services necessary to insure Buyer's continued use of the Software. Such services will be performed on a time and material basis at Developer's then current hourly rates for such services.

17. **NO WAIVER**. The failure of a Party to require strict performance of any provision of this Agreement by the other, or the forbearance to exercise any right or remedy, shall not be construed as a waiver by such Party of any such right or remedy or preclude any other or further exercise thereof or the exercise of any other right or remedy.

18. **SEVERABILITY**. The invalidity or unenforceability of any provision of this Agreement does not affect the validity or enforceability of any other provision of this Agreement.

19. **ENTIRE AGREEMENT; AMENDMENTS.** This Agreement has been freely negotiated and contains the entire understanding between the Parties for the software development outlined herein. The Parties acknowledge that they have read and understand the terms contained herein and agree to same. This Agreement supersedes all prior agreements, representations, or understanding (whether written, oral, implied, or otherwise) between the Parties. These terms may not be amended or modified, in whole or in part, except by an express written agreement between the Parties.

20. **APPLICABLE LAW.** This Agreement shall be construed and governed by the laws of the State of Utah. Any court action to enforce this Agreement or relating to or arising out of this Agreement or the Software as developed by Developer, shall be brought in the state or federal courts in the State of Utah. The prevailing party shall be entitled to collect any reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which the prevailing party may be entitled.

21. **HEADINGS**. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of any provision of this Agreement.

22. **COUNTERPARTS; FACSIMILE AND ELECTRONIC SIGNATURES.** This Agreement may be executed in counterparts, all of which together shall constitute one and the same agreement. Any electronic signature shall have the full weight and authority as an original signature on this Agreement. Additionally, any signature page delivered electronically or by facsimile shall be binding to the same extent as an original signature page with regards to any agreement subject to the terms hereof or any amendment hereto.

23. **NOTICES**. All notices or other communications required or permitted hereunder or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when mailed by certified or registered mail, postage prepaid, or by commercial overnight delivery services addressed to the specific Party at the address provided herein. Should any communication be sent via electronic mail, it shall be deemed received upon the sender's receipt of an acknowledgement from the intended receipt (such as by "return receipt requested" function as available, return email, or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

**IN WITNESS WHEREOF, the Parties have executed this Agreement by the duly authorized representatives identified below and as of the Effective Date of this Agreement.**

**"BUYER"**

*Aaron Tilton*

---

Signature of Authorized Company Representative

---

Aaron J. Tilton

**"DEVELOPER"**

---

Signature of Authorized Company Representative

---

Daniel K. J. Stadelmann

# EXHIBIT B



# Amendment to Software Development Agreement

This Software Development Agreement (the "Agreement") is an amendment to the original SDA from March 15th, 2021 and is entered into and made effective this 22nd day of November, 2021 (the "Effective Date"), by and between **Power Block Coin LLC.**, represented by Aaron J. Tilton, solely in his capacity as a manager of Buyer, with registered offices at 1145 South 800 East, Suite 117, Orem Utah 84097 (the "Buyer") and **UTXO B.V**, represented by UTXO Lead Developer Daniel K. J. Stadelmann, with registered offices at Posthoornstraat 17. 3011WD Rotterdam, Netherlands (the "Developer"). The Buyer and the Developer shall collectively hereinafter be known as the "Parties" or "Party," as applicable.

**WHEREAS**, the Developer offers software development services with respect to custom blockchain systems and architecture design/development;

**WHEREAS**, the Buyer desires to retain the Developer to perform software development in connection with a custom blockchain system and network deployment;

**WHEREAS**, the Parties desire to enter into a business relationship pursuant to which, among other things, the Developer would develop such software with desired features and capabilities as specified by the Buyer; and

**WHEREAS,** this Agreement is intended to outline the terms and conditions applicable to the software development aspects of such business relationship between the Parties.



SDA - CONFIDENTIAL - UTXO BV - November 2021

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto covenant and agree as follows:

1. **DESCRIPTION OF ADDITIONAL SERVICES OUTSIDE THE SCOPE OF INITIALLY DEFINE SERVICES IN THE AGREEMENT FROM March 15th 2021.** The Developer shall serve as an independent contractor of Buyer to design, develop, and implement various DeFi (decentralized Finance) technologies  consisting of the following development phases and modules but not limited to these and the items outlined in Exhibit A:

1. **SmartFi Smart Chain Platform (BSC fork)**
   a. This project consist of inception and development phase:
      i. Architecture/System Design (SRS/SDP)
      ii. Development
   b. In addition the final platform codebase undergoes full **Quality Assurance** process
   c. **Revision**
   d. **Deployment and ongoing maintenance**

   **estimated cost: $600.000,00**

2. **Security Operations supervision and management**
   a. UTXO BV staff oversees (in advisory position) security operations including tasks such as regular assessments, security related analysis, code reviews, correspondence with external security firms, technology stack choice consulting, et cetera.
   b. UTXO BV staff assists the Power Block Coin team with cyber security related countermeasures integration for threats and ongoing attacks.

   **estimated cost:  $240,000.00**

3. **SmartFi Portal Quality Assurance and Development assistance/consulting**
   a. UTXO BV staff and specifically the UTXO Quality Assurance Department executes manual and automated tests and works together with the PBC/SmartFI team to enhance and improve overall QA process toward optimal and state-of-the-art procedure.
   b. UTXO BV staff and specifically UTXO BV core developers assist the PBC/SmartFI team in software development relevant questions and provide support and active development help when required for the CeFi related project success.

   **estimated cost: $360,000.00**

SDA - CONFIDENTIAL - UTXO BV - November 2021

**4. SmartFi Pancake Swap UI Implementation**
   a. This project consist of inception and development phase:
      i. Frontend "Clone" inception (codebase analysis, feasibility evaluation, rebranded layout/design, feature requirements SoW, UI specifications)
      ii. Implementation/Development
   b. In addition the final platform codebase undergoes full **Quality Assurance** process
   c. **Revision**
   d. **Deployment and ongoing maintenance**

**estimated cost: $240,000.00**

The Parties shall work together to develop separate, more detailed documents to outline precise software specifications, timelines (including, but not limited to, roll out deadlines and phases of completion) and set expectations as to delivery of such Software. Timelines for final delivery of all software modules of the DeFi Software, including all versions in either source code or object code form, will be set after completion of corresponding inception phases.

The timelines and specifications addressed herein should be in a format that makes these enforceable, measurable, and accurate to assist both the Buyer and the Developer in planning and delivery stages. The Parties agree that the Developer will draft the initial timelines and specifications of the Software development during the execution of the development phase related to this agreement. The Buyer shall then receive a copy of same, and the Parties will work to negotiate a mutually-agreeable plan for the development of the Software. The Parties acknowledge and agree that this outline shall be as detailed as possible, as inadequate specifications could cause the Buyer to incur costs for variations and extensions to ensure that the final version of Software is suitable and achieves the objectives for its development.  In the event that the parties cannot negotiate a mutually-agreeable plan for the development of the Software, Buyer shall have the right to terminate the Agreement. Such service shall only be provided with the prior written consent of the Buyer.

The Developer shall assist and consult with the Buyer concerning ancillary and related software and IT/infrastructure for the development and/or installation of the Software. However, it shall be Buyer's responsibility to purchase, install, and maintain any such products. Any service done by the Developer in this regard, or beyond the scope of this Software Development Agreement shall be done as a separate service from the development of the Software and the service shall be performed on an hourly basis at the rate of $*300* per hour, payable upon receipt of detailed invoice from Developer.

The Parties agree that time is of the essence and desire to timely identify any critical elements of the Software development and/or any specific deliverables. Once these timelines and deadlines are agreed upon, the Parties agree that processes will be disrupted should these deadlines pass without deliverable product. The Parties agree that liquidated damages would be appropriate for any delay in

SDA - CONFIDENTIAL - UTXO BV - November 2021

the project beyond the expected deadlines (as adjusted from time to time). A fee of Thirty Thousand and Zero Dollars ($30,000.00) shall be due from Developer to Buyer should any module of this project (modules TBA) extend beyond its deadline by more than one (1) month ("Deadline Fee"). The Deadline Fee shall accrue at the end of the one (1) month extension deadline.

2. **CHANGE IN SPECIFICATIONS**. Buyer may, in its sole discretion, request that changes be made to the specifications or other aspects of this Agreement and tasks associated with the Agreement. If Buyer requests such a change, Developer will use its best efforts to implement the requested change at no additional expense to Buyer and without delaying delivery of the Software. In the event that the proposed change will, in the reasonable opinion of Developer, require a delay in delivery of the Software or would result in additional expense to Buyer, then Buyer and Developer shall confer and Buyer shall, in its sole discretion, elect either to withdraw its proposed change or require Developer to deliver the Software with the proposed change subject to the delay and/or additional expense.

3. **FURTHER DEVELOPMENT.** Further development of Software may be contemplated by the Parties. For any upgrades, modifications, or projects beyond maintenance of the current Software (as described in module1 inception phase report), the Parties shall execute a new agreement and services shall be contingent upon negotiation of a mutually-agreeable fee and the availability of the Developer and/or Developer's personnel to complete such work.

4. **COMPENSATION**. Buyer shall pay Developer a total **additional** yearly development fee of $1.200.000,00 (One Million Two  Hundred Thousand and Zero Dollars) ("Compensation") for software development and maintenance during the term of twelve months (one year). The Parties agree that Buyer shall pay the additional fee pro rata over the course of the term of the agreement. The breakdown of expenses/expense allocation is outlined in **Exhibit B**.

1. **Expenses**. Buyer shall reimburse Developer for reasonable out-of-pocket expenses, including, but not limited to, airfare, lodging, meals, and automobile rental incurred by Developer during the development of Software on behalf of Buyer and expenses incurred as a direct result of a request for travel from the Buyer. Developer shall complete paperwork as reasonably requested by the Buyer and provide supporting documentation of all expenses incurred. Travel expenses shall be reimbursed for Developer's personnel essential to the Software development project with Buyer. In the event that the expenses are anticipated to be over $100 USD, Developer shall seek pre-approval of anticipated expenses from the Buyer.



SDA - CONFIDENTIAL - UTXO BV - November 2021

2.  **<u>Maintenance</u>**. "Maintenance" shall be limited to services necessary to keep the current Software functioning properly (based upon the Software's agree-upon scope of work), including critical security bug fixes, but shall not include any new features, modifications, improvements and/or upgrades – the same applies for network or infrastructure operations beyond the initial deployment scope.

5.  **TERM**. This Agreement shall commence as of the Effective Date written above (November 1st 2021) and shall continue until one (1) year beyond the final delivery date of the Software, including all versions in either source code or object code form, to allow for the maintenance (the "Term").

6.  **TERMINATION**. This Agreement shall terminate upon the occurrence of any of the following: (i) in the event either Party defaults in any material obligation owed to the other Party pursuant to this Agreement, then this Agreement may be terminated if the default is not cured following at least forty-five (45) days' written notice to the defaulting party or (ii) either party is bankrupt or insolvent, or bankruptcy or insolvency proceedings are instituted against a Party and the proceeding is not dismissed within sixty (60) days of commencement. The terms under Ownership of Software and Confidentiality in this Agreement shall survive the expiration or termination of this Agreement.

7.  **PERFORMANCE AND ACCEPTANCE TESTING**. Acceptance testing will follow each key stage of Software development and delivery to the Buyer. The Buyer shall test the Software according to the specifications outlined for the services. The Buyer shall perform such acceptance testing within fourteen (14) business days from receipt of that phase of Software development. At such time (or earlier if applicable), the Buyer shall communicate to the Developer any issues that arise during the acceptance testing. The Developer will then review any deviations, correct them, and re-submit in a timely and reasonable manner to the Buyer for additional acceptance testing.

8.  **OWNERSHIP OF SOFTWARE**. Developer agrees that the development of the Software is "work made for hire" and that the Software shall be the sole property of Buyer. Developer hereby assigns to Buyer, without further compensation, all of its rights, including but not limited to derivative rights, title, and interest in and to the custom Software elements and any and all related patents, patent applications, copyrights, copyright applications, trademarks, trademark applications, and trade names in the United States and elsewhere. Developer will keep and maintain adequate and current written records with respect to the Software (in the form of notes, sketches, drawings, and as may otherwise be specified by Buyer), which records shall be available to and remain the sole property of Buyer at all times. All versions of the Software shall contain Buyer's conspicuous notice of copyright. Developer will assist Buyer in obtaining and enforcing patent, copyright, and other forms of legal protection for the Software in any country. Upon request, Developer will sign all applications, assignments,

instruments, and papers and perform all acts necessary or desired by Buyer to assign the Software fully and completely to Buyer and to enable Buyer, its successors, assigns, and nominees, to secure and enjoy the full and exclusive benefits and advantages thereof. Developer will not provide any copy of the Software to any party other than Buyer.

9. Developer informs Buyer that the developed software does utilise third party open source libraries and software whose licenses remain unaffected by this agreement.

9. **WARRANTIES**.

   1. **Warranty**. Developer hereby warrants to Buyer that any software developed, and Buyer's use of it, does not infringe on any third-party copyright, patent or trademark.

   2. **Indemnity**. Additionally, Developer hereby agrees to indemnify and hold harmless the Buyer (and its respective directors, officers, manager, partners, members, shareholders, affiliates, agents, attorneys, successors, and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages, and expenses (including, but not limited to, reasonable attorneys' fees, charges, and disbursements) incurred by the Developer as a result of any third-party copyright, patent or trademark infringement claim arising out of any software developed under this Agreement.

   3. **Software Warranty**. Developer warrants that for a period of one year commencing on the date of Buyer's Acceptance of the Software ("Software Warranty Period"), provided the Software is not altered by Buyer, and provided the Software is used in accordance with Developer's recommended maintenance procedures, the Software shall function during the Software Warranty Period without defects which materially affect Buyer's use of the Software in accordance with Buyer's Specifications for the Software. In the event the Software fails to so perform and Buyer's use of the Software is materially affected by such failure, Buyer's exclusive remedy under this warranty is to require Developer to correct such failure and such remedy is conditioned upon Developer's receiving written notice (or oral notice promptly confirmed in writing) within this period of such failure. The correction of any Software failure shall not extend the Software Warranty Period.

10. **INDEPENDENT CONTRACTOR**. Developer is acting as an independent contractor with respect to the services provided to Buyer. Neither Developer nor the employees of Developer performing services for the Buyer will be considered employees or agents of the Buyer. Buyer will not be responsible for Developer's acts or the acts of Developer's employees while performing services under this Agreement. Nothing contained in this Agreement shall be construed to imply a joint venture, partnership, or principal-agent relationship between the Parties, and that neither Party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other Party.

SDA - CONFIDENTIAL - UTXO BV - November 2021

1.  **Development Staff**. Developer will utilize employees and/or contractors capable of designing and implementing the Software to be developed hereunder. All work shall be performed in a professional and competent manner. Developer shall arrange for such employees and/or contractors, if any, to execute and deliver any document or instrument reasonably requested by Buyer to reflect Buyer's ownership of the Software or in connection with any application for patent or copyright. Developer confirms that its employees and/or contractors signed a confidentiality agreement concerning the Software development for Buyer, prior to working on the project.

2.  **Monitoring**. Buyer shall have the right to reasonably observe and monitor all aspects of the performance by Developer of its obligations hereunder and Developer shall use reasonable efforts to facilitate such observation and monitoring. Information, functions, and operations of Developer not directly related to its obligations hereunder shall not be subject to observation and monitoring by Buyer.

11. **CONFIDENTIALITY**. Developer acknowledges that all material and information supplied by Buyer which has or will come into Developer's possession or knowledge of Developer in connection with its performance hereunder is to be considered Buyer's confidential and proprietary information (the "Confidential Information"). By way of example, but not as a limitation, Confidential Information includes the Software, trade secrets, processes, data, knowhow, program codes, documentation, flowcharts, algorithms, marketing plans, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee and customer lists. Developer's undertakings and obligations under this section will not apply, however, to any Confidential Information which: (i) is or becomes generally known to the public through no action on Developer's part, (ii) is generally disclosed to third parties by Buyer without restriction to such third parties, or (iii) is approved for release by written authorization of Buyer. Upon termination of this Agreement or any other time upon request, Developer will promptly deliver to Buyer all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Developer or others, which contain Confidential Information. Developer acknowledges that Confidential Information is the sole property of Buyer. Developer agrees that disclosure of such information to, or use by, third parties, either during or after this Agreement, will cause Buyer irreparable damage. Developer agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Developer's employees or contractors with a need to know such information and not to release or disclose it to any other party. Developer further agrees not to release such information to any employee or contractor who has not signed a written agreement between the Developer and the employee or contractor expressly binding the employee or contractor not to disclose the Confidential Information, except as expressly permitted herein. Buyer shall be listed as a third-party beneficiary of any such agreement. Developer will notify Buyer in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information. At any time, upon request, the Developer will return any such information within its possession to Buyer. In the event that a third party seeks to compel production of the

SDA - CONFIDENTIAL - UTXO BV - November 2021

Confidential Information as part of a legal proceeding, Developer shall immediately notify Buyer so Buyer can determine necessary steps to protect the Confidential Information.

12.

Developer acknowledges that Buyer's purpose in pursuing the development of the Software is to gain a significant competitive advantage over competitors operating without such Software and that such advantage will be jeopardized if such competitors learn of Buyer's negotiations with Developer or the performance by Developer of its obligations hereunder. Accordingly, Developer agrees to keep such negotiations and performance of its obligations hereunder strictly confidential and not to disclose any information to any third party or entity without the prior written permission of Buyer. In no event shall Developer or any of its employees or contractors use Buyer as a reference in marketing Developer's services to any third party or entity without Buyer's prior written permission.

12. **TRAINING**. Developer shall provide Buyer and its employees with training consultations with respect to the use of the Software as may reasonably be requested by Buyer from time to time for six (6) months after final delivery and acceptance at no additional costs to Buyer ("Training Period"). Developer shall deliver a detailed user's manual to Buyer on or before completion of acceptance that will enable Buyer's employees who are otherwise unfamiliar with the Software to become adequately informed about using the blockchain daemon RPC interface. All training that Developer is required to provide hereunder shall be performed at such locations and at such times as are mutually agreed to by the Parties. Upon the expiration of the Training Period and following Buyer's request, Developer will provide any support services necessary to insure Buyer's continued use of the Software. Such services will be performed on a time and material basis at Developer's then current hourly rates for such services.

13. **NO WAIVER**. The failure of a Party to require strict performance of any provision of this Agreement by the other, or the forbearance to exercise any right or remedy, shall not be construed as a waiver by such Party of any such right or remedy or preclude any other or further exercise thereof or the exercise of any other right or remedy.

14. **SEVERABILITY**. The invalidity or unenforceability of any provision of this Agreement does not affect the validity or enforceability of any other provision of this Agreement.

15. **ENTIRE AGREEMENT; AMENDMENTS.** This Agreement has been freely negotiated and contains the entire understanding between the Parties for the software development outlined herein. The Parties acknowledge that they have read and understand the terms contained herein and agree to same. This Agreement supersedes all prior agreements, representations, or understanding (whether written, oral, implied, or otherwise) between the Parties. These

SDA - CONFIDENTIAL - UTXO BV - November 2021

terms may not be amended or modified, in whole or in part, except by an express written agreement between the Parties.

16. **APPLICABLE LAW.** This Agreement shall be construed and governed by the laws of the State of Utah. Any court action to enforce this Agreement, or relating to or arising out of this Agreement or the Software as developed by Developer, shall be brought in the state or federal courts in the State of Utah.The prevailing party shall be entitled to collect any reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which the prevailing party may be entitled.

17. **HEADINGS**. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of any provision of this Agreement.

18. **COUNTERPARTS; FACSIMILE AND ELECTRONIC SIGNATURES.** This Agreement may be executed in counterparts, all of which together shall constitute one and the same agreement. Any electronic signature shall have the full weight and authority as an original signature on this Agreement. Additionally, any signature page delivered electronically or by facsimile shall be binding to the same extent as an original signature page with regards to any agreement subject to the terms hereof or any amendment hereto.

19. **NOTICES**. All notices or other communications required or permitted hereunder or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when mailed by certified or registered mail, postage prepaid, or by commercial overnight delivery services addressed to the specific Party at the address provided herein. Should any communication be sent via electronic mail, it shall be deemed received upon the sender's receipt of an acknowledgement from the intended receipt (such as by "return receipt requested" function as available, return email, or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

SDA - CONFIDENTIAL - UTXO BV - November 2021

**IN WITNESS WHEREOF, the Parties have executed this Agreement by the duly authorized representatives identified below and as of the Effective Date of this Agreement.**

**"BUYER"**

*Aaron Tilton*

_____

Signature of Authorized Company Representative

_____

Aaron J. Tilton

**"DEVELOPER"**

_____

Signature of Authorized Company Representative

_____

Daniel K. J. Stadelmann

10/8

SDA - CONFIDENTIAL - UTXO BV - November 2021

# Exhibit A

## SmartFi Smart Chain Platform (BSC fork) - SFC (SmartFiChain Platform)

This project consists of a development plan and scope of work creation in order to estimate realistic timeline and resource requirements for the development of a Binance Smart Chain fork/clone to serve as the core SmartFi Smart Chain Platform. Furthermore this project/module does include a dedicated recruitment campaign (headhunting phase) to find and hire skilled and highly competent IT project managers, blockchain architecture experts, software developers, cyber security experts and form a core SFC-team. As a rough estimation we are looking to recruit a total of five to six (5-6) additional engineers for this project.

The SFC Platform will function similarly to the BSC Platform whereas the SMTF Token (or a SFC migrated version) will function as the ecosystem utility token with a speculative nature as outlined in the previous SMTF feature descriptions.

The SFC Platforms chain propagation is secured by a role called "validators" whereas the SmartFI/PBC team does nominate validators according to its own criterias. Optionally the SFC Platform can function similarly to the BSC Platform in this specific regards.

The SFC Platform will be compatible with BSC and ERC/ETH based EVM executed smart contracts developed in solidity whereas all ERC/BSC based tools will be compatible and reusable in the SFC Platform.

Expected approximate cost-estimation for this project/task: 50,000.00 USD (fifty thousand USD) per month - 600,000.00 USD p.a.

SDA - CONFIDENTIAL - UTXO BV - November 2021

## Security Operations supervision and management

In order to ensure platform wide (CeFi and DeFi) safety in regards to cyber security threats the UTXO BV team will oversee and manage external security firms, correspondence, independent secure code reviews and assessments, et cetera. This does include but it is not limited to regular pentests, secure code reviews and real-time monitoring.

We are looking to hire two (2) additional cyber security experts to cover these cyber security related responsibilities.

Expected approximate cost-estimation for this project/task:   20,000.00 USD (twenty thousand US Dollars) per month - 240,000.00 USD p.a.

## SmartFi Portal Quality Assurance and Development assistance/consulting

The UTXO BV Team will provide PBC and the SmartFi project team assistance, advice and active support in manual as well as automated software testing across the entire SmartFi platform including but not limited to the CeFi stack (portal). UTXO will ensure testing, both internal and external, is taking place according to state of the art procedures and using state of the art technology and tools. In addition to this UTXO BV team will enhance and optimize the SmartFi internal QA processes together with the SmartFi team and provide know-how and dedicated resources in order to achieve this. UTXO BV is looking to expand the QA and devops team by three to four (3-4) additional QA and devops engineers in order to ensure all DeFI and CeFi tools and software technologies meet the expectation ref robust and flawless software.

Expected approximate cost-estimation for this project/task: 30,000.00 USD (thirty thousand US Dollars) per month - 360,000.00 USD p.a.



SDA - CONFIDENTIAL - UTXO BV - November 2021

# SmartFi Pancake Swap UI implementation

The UTXO BV Team analyses Pancake Swap and the GUI implementation (frontend) in order to plan and develop a GUI "clone" with custom branding/layout and specific feature requirements within the Pancake Swap functionality scope. This project requires one additional frontend developer and one solidity developer for ongoing maintenance, upgrades, test (together with QA-team), et cetera.

Expected approximate cost-estimation for this project/task: 20,000.00 USD (twenty thousand US Dollars) per month - 240,000.00 USD p.a.

## Exhibit B - Breakdown of Expenses p.a.:

| Service | Term | Cost |
|---|---|---|
| SmartFi Smart Chain Platform | | $ 600,000.00 |
| Security Operations supervision and management | | $ 240,000.00 |
| SmartFi Portal Quality Assurance and Development assistance/consulting | | $ 360,000.00 |
| SmartFi Pancake Swap UI implementation | | $ 240,000.00 |
| Total cost | | $ 1,440,000.00 |
| Discount | | $ 240,000.00 |
| Total | | $ 1,200,000.00 |

Note: In addition to outlined resource and cost estimation the UTXO BV team is looking to expand the general team by two to three (2-3) IT project managers.

13/8

# EXHIBIT C

| Type | Date | Invoice | Name | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| Bill | 03/31/2021 | PBC0009 | UTXO B.V. | Longterm Collaboration Agreement / Installment 1 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 04/05/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 04/30/2021 | PBC0010 | UTXO B.V. | Longterm Collaboration Agreement / Installment 2 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 04/15/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 05/31/2021 | PBC0011 | UTXO B.V. | Longterm Collaboration Agreement / Installment 3 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 05/25/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 06/30/2021 | PBC0012 | UTXO B.V. | Longterm Collaboration Agreement / Installment 4 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 06/15/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 07/01/2021 | PBC0013 | UTXO B.V. | Longterm Collaboration Agreement / Installment 5 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 07/15/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 08/01/2021 | PBC0014 | UTXO B.V. | Longterm Collaboration Agreement - Installment 6 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 08/13/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 09/01/2021 | PBC0015 | UTXO B.V. | Longterm Collaboration Agreement - Installment 7 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 09/20/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 10/15/2021 | PBC0016 | UTXO B.V. | Longterm Collaboration Agreement - Installment 8 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 10/29/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 11/01/2021 | PBC0017 | UTXO B.V. | Longterm Collaboration Agreement - Installment 9 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 11/15/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 12/01/2021 | PBC0018 | UTXO B.V. | Longterm Collaboration Agreement - Installment 10 | | 150,000.00 | -150,000.00 |
| Bill Pmt-Check | 12/15/2021 | WIRE | UTXO B.V. | | 150,000.00 | | 0.00 |
| Bill | 01/31/2022 | PBC0020 | UTXO B.V. | Longterm Collaboration Agreement - Installment 11 / SDA Amendment - Installment 2 | | 250,000.00 | -250,000.00 |
| Bill Pmt-Check | 02/02/2022 | Wire | UTXO B.V. | | 250,000.00 | | 0.00 |
| Bill | 12/10/2021 | PBC0019 | UTXO B.V. | SDA Amendment - Installment 1 | | 108,000.00 | -108,000.00 |
| Bill | 04/01/2022 | PBC0023 | UTXO B.V. | SDA Amendment - Installment 5 (Invoice Correction - KSC / SC) | | 100,000.00 | -208,000.00 |
| Bill | 03/31/2022 | PBC0022 | UTXO B.V. | Longterm Collaboration Agreement - Installment 13 / SDA Amendment installment 4 | | 250,000.00 | -458,000.00 |
| Bill | 02/28/2022 | PBC0021 | UTXO B.V. | Longterm Collaboration Agreement - Installment 12 / SDA Amendment installment 3 | | 250,000.00 | -708,000.00 |
| Bill Pmt-Check | 03/23/2022 | WIRE | UTXO B.V. | | 320,000.00 | | -388,000.00 |
| Bill Pmt-Check | 04/29/2022 | WIRE | UTXO B.V. | | 124,000.00 | | -264,000.00 |
| Bill | 05/31/2022 | PBC0024 | UTXO B.V. | SDA Amendment - Installment 6 (Invoice Correction - KSC / SC) | | 100,000.00 | -364,000.00 |
| Bill Pmt-Check | 05/31/2022 | Wire | UTXO B.V. | | 124,000.00 | | -240,000.00 |
| Bill | 06/30/2022 | PBC0025 | UTXO B.V. | SDA Amendment - Installment 7 | | 133,000.00 | -373,000.00 |
| Bill Pmt-Check | 06/30/2022 | | UTXO B.V. | | 157,000.00 | | -216,000.00 |
| Bill | 07/31/2022 | PBC0026 | UTXO B.V. | SDA Amendment - Installment 8 | | 133,000.00 | -349,000.00 |
| Bill Pmt-Check | 07/29/2022 | | UTXO B.V. | | 157,000.00 | | -192,000.00 |
| Bill | 08/15/2022 | PBC0027 | UTXO B.V. | Billed as "SDA Amendment - Installment 8" instead of Installment 9 | | 133,000.00 | -325,000.00 |
| Bill Pmt-Check | 08/31/2022 | | UTXO B.V. | | 157,000.00 | | -168,000.00 |
| Bill | 09/20/2022 | PBC0028 | UTXO B.V. | Billed as SDA Amendment - Installment 9 instead of Installment 10 | | 133,000.00 | -301,000.00 |
| Bill Pmt-Check | 10/04/2022 | Wire | UTXO B.V. | | 157,000.00 | | -144,000.00 |
| Bill | 10/31/2022 | PBC0029 | UTXO B.V. | Billed as "SDA Amendment - Installment 10" instead of Installment 11 | | 133,000.00 | -277,000.00 |
| Bill Pmt-Check | 10/31/2022 | Wire | UTXO B.V. | | 157,000.00 | | -120,000.00 |
| Bill | 11/30/2022 | PBC0030 | UTXO B.V. | Billed as SDA Amendment - Installment 10 instead of Installment 12 | | 133,000.00 | -253,000.00 |
| Bill Pmt-Check | 11/30/2022 | | UTXO B.V. | | 157,000.00 | | -96,000.00 |
| | | | | | 3,260,000.00 | 3,356,000.00 | -96,000.00 |

# EXHIBIT D

| | |
|---|---|
| **From:** | Accounts Payable <accountspayable@powerblockcoin.com> |
| **Sent:** | Wednesday, January 4, 2023 7:03 AM |
| **To:** | Jason Brown |
| **Cc:** | Aaron Tilton; Brad Jones; Tom Retson; Kadan Stadelmann |
| **Subject:** | UTXO Invoice Discrepancies - Updated |
| **Attachments:** | UTXO History.pdf |

Hello Jason,

Apologies for the last email sent a few minutes ago, please ignore it. While conducting our year end annual review on our accounts we've noticed that we've overpaid by $54,000 as of today.  Please note in the attached spreadsheet are all the bills and checks associated with your account. According to the contract there are 12 initial installments at $150,000 followed by 12 SDA Amendment Installments at $100,000/Installment. According to our records, Installment 13 that was a part of invoice ID PBC022 for $150,000 was over billed, therefore should not have been paid. As of today, our records show we paid $3,260,000. The 3,260,000 is allocated per following:

Excepted:

1,800,000= Initial Installments/$150,000 * 12
1,200,000= SDA Installments/$100,000   * 12
198,000= Developer and Engineering *6
8,000= Paladin Smart Contract

**3,206,000** Total Excepted

**3,260,000** Actual Paid

**54,000 Difference** Overpaid To-date

Also, we have revised the past invoices PBC0027, PBC0028, PBC0029, and PBC0030 to reflect actual SDA installment as seen in the PDF attached; however, we ask that you confirm our findings and re-issue the latest invoice to ensure that our records are in alignment w/yours.

If you have any questions, or would like to discuss this information in greater detail, please do not hesitate to contact Sinan Causevic or on this e-mail (accountspayable@powerblockcoin.com).

Thanks

Sinan